LOUIS, Respondent, v. LOUIS, Appellant.

St. Louis Court of Appeals, December 29, 1908.

1. **DIVORCE: Abandonment.** In an action for divorce brought by the wife on the ground of abandonment, the evidence is examined and held sufficient to show a case of abandonment.by the husband without good cause.

2. ————: **Judgment: Res Judicata.** In an action for divorce, a former judgment denying a decree in an action between the same parties, where the ground alleged was indignities, is not *res judicata* except to the extent that the indignities alleged in the former petition were not sufficient to warrant a decree.

3. **PRACTICE: Evidence Excluded: Failure to Set out What is Expected to Prove.** The appellate court cannot review an alleged error based on the refusal of the trial court to hear evidence, where the record does not show what the party excepting expected to prove.

4. **DIVORCE: Abandonment.** In an action for divorce on the ground of abandonment, where the conduct and the correspondence between the parties, after a dismissal of a former petition and cross bill for divorce between the same parties, showed the wife was willing to resume the marital relation but the husband made unreasonable conditions and demonstrated his lack of a desire to live with her or affection for her, it was sufficient to make out a case of abandonment.

Appeal from St. Louis City Circuit Court.—*Hon. Matt. G. Reynolds,* Judge.

AFFIRMED.

*Rassieur, Schnurmacher & Rassieur* and *G. Wm. Senn* for appellant.

*Dalton & Harris* for respondent.

BLAND, P. J.—On November 14, 1906, plaintiff and defendant were married, in the city of St. Louis. They rented a flat and went to housekeeping, and continued to make the flat their home until the sixth of February, 1907, when plaintiff, without the knowledge and consent of defendant, moved all their furniture (about $500 worth) and took herself to her mother's home, in said city, where she has since resided. On February 11, 1907, plaintiff, claiming to be the owner of the furniture, executed a mortgage on the same to secure the payment of a note for $216, which she gave her mother for eight months' board in advance. This mortgage was filed and recorded. On the ninth of February, three days after she left her husband, plaintiff filed her petition for a divorce, in the circuit court of the city of St. Louis, alleging indignities as grounds therefor. She afterwards filed an amended petition in which indignities were set out as grounds for divorce. Defendant answered the amended petition and admitted the marriage but denied all other allegations of the petition. On plaintiff's motion, defendant was ordered to pay her $150 alimony *pendente lite* and for counsel fees. Defendant made payment as ordered. The case was heard on June 5, 1907. A divorce was denied and the petition was dismissed. No appeal was taken from this judgment.

On June 15, 1908, the present action was commenced. After stating the date of the marriage, the petition alleges, in substance, that on June 6, 1907, defendant abandoned plaintiff and has ever since failed and refused to maintain and provide for her. The answer admitted the marriage, alleged, in substance, that plaintiff abandoned defendant on February 5, 1906, alleged the institution of the suit for divorce, its deter-

mination adversely to plaintiff, alleged the mortgage of the household goods by plaintiff was made to secure a fictitious debt, and the fact that the goods were defendant's property, alleged the fact to be that after the dismissal of plaintiff's petition for divorce, and after defendant rented rooms that plaintiff and defendant might resume cohabitation upon plaintiff's surrender of the mortgaged goods with which to equip the rented rooms, that plaintiff refused to give up the goods. After hearing the evidence, the court found the issues for plaintiff· and ordered defendant to pay her ten dollars per week for her support· and required defendant to furnish security for its payment. A timely motion for new trial proving of no avail defendant appealed.

Plaintiff, in respect to the treatment she received from her husband said it was "very bad," and in reply to the question, "Well, how would he treat you? In what way was it bad?" testified as follows: "Constant scolding and nagging, always faultfinding. I was always doing something that didn't suit him, and I simply could not suit him. The more I did the more he had to scold. It was the cause of my getting sick, because I couldn't stand it." Continuing, plaintiff testified that she had brain trouble and nervous prostration and two weeks after her marriage became so sick she had to go to her mother's where she was confined to her bed for sixteen days. Plaintiff's mother testified that during the first week or ten days of this illness, plaintiff was either unconscious or delirious. Dr. M. R. Hughes, a specialist in brain and nervous diseases, testified that he treated plaintiff for rush of blood to the brain and nervous prostration; that she would come to him "and would seem to be disgruntled over her situation with her husband, and she didn't seem to gain very much, and that seemed to be the main thing that kept her back, and I told her that if she couldn't get along that she had better go home and stay there, and then her

treatment probably would be of more decided benefit to her. . . . The whole thing was this disagreement between herself and her husband. It kept her in a state of excitation, so much so that the treatment she was getting didn't satisfy me and didn't seem to benefit her. Every day it was the same old story about her husband and her not getting along, which led me to believe that that was the condition, or the 'thorn in the flesh,' so to speak, that kept her in this state. Witness further testified as follows:

"Mr. Dalton: Don't you know, to refresh your memory, it was on account of sexual relations? A. Well, I remember now that it was, yes.

"Q. And that was why you advised her to leave, on that account? A. Well, on account of the condition she was in I thought it was best for her to go home to effect a cure, for them to be separated . . . It was my idea that if they were separated that she would have an opportunity to regain her normal condition; that I didn't see how she could under the existing circumstances, because I had had her under observation about a month, and these cases generally show some kind of progress, but she would come day in and day out and it was the same old story, you know, and that was the reason I suggested that she go home."

Plaintiff testified that when she was able to get up she returned to her home and tried to do the housework, but was sick and unable to do so; that her husband refused to let her have hired help and her mother came over every morning and helped her do the work; that she consulted Dr. Hughes a second time and he asked her the cause of her getting worse; that she told him it was on account of the treatment she received from her husband, and Dr. Hughes told her she would have to leave him: "that I never would be anything while I was with him; that if I stayed with him much longer I would be so that I never would be well and could say

that I never would be anything." Plaintiff testified she went home to her mother, but said: "Not from what the doctor told me, though, because I stayed and went through it all, even after what the doctor told me." Witness further testified as follows:

"Q. You stayed there then?  A.  I stayed there, yes, sir.

"Q. Until it was necessary for you to go home? A.  Until I simply had to, and then being sick the way I was.

"Q.  Now, when you went home were you sick? A.  Very sick, yes, sir. . . . .

"Q.  What was your condition, Mrs. Louis, as to your mental condition?  A.  Well, I lost my mind.

"Q.  How long were you affected that way?  A. Seven weeks I was in bed.

"Q.  Seven weeks out of your mind?  A. Well, I couldn't say I was out of my mind the whole time but I was in bed seven weeks.  The greater part of the time I was out of my mind, though."

Plaintiff's mother is a widow and dependent on her son for support.  Plaintiff's testimony shows she executed the chattel mortgage and note to her mother as security for taking care of her, for the reason she was unable to earn anything, or help her mother do the housework.

Defendant testified he had never had any trouble with his wife; that they "got along all right together," and said he refused to hire help because he was not able to do so, and that he paid his wife's doctor bills. Defendant swore, positively, that he did not make his wife a present of the household goods and that they cost him about $500.  Plaintiff and her mother both testified that defendant gave his wife the goods as a birthday present.

After the dismissal of the divorce suit, the following correspondence was had between the parties:

"St. Louis, Mo., June 8, 1907.

"Dear Henry: Having thought the matter over, don't you think it would be better for us both to let the past be past, and start life over.

"If you will forget and forgive, so will I. Why should there not be many happy days for us yet; we are not the only ones who have made mistakes.

"When you have a home ready for me, I will come back to you. If you look for rooms, do not take more than three, but in case you have not time to look for them, let me know and I will do so.

"Hoping this will be satisfactory to you, and that I may hear from you soon, I am

"Your true wife,
"THEKLA."

"St. Louis, June 17, 1907.
"Mrs. Thekla Louis,
3006 Manchester Avenue, City.

"Dear Thekla: Your note dated the 8th inst. received by me last Tuesday morning.

"For the present I can make no other comment upon the suggestions you express, than to remind you that the recent difficulties precipitated by you have put me to much expense for lawyer's services and other costs, and placed me absolutely in financial debt to others. This leaves me in no position to equip another household at this time, nor, frankly, am I prepared to make any outlay for rent, nor to incur any further liabilities by contracting to rent quarters, so long as I am not ready and do not know that I can depend on furnishing any rooms if I should rent them. In the matter expressed, the further fact considered,—that you, and not I, continue to retain the possession of my household belongings, and that I am, until you see fit to return to me possession of my household effects, dependent on your wish, whether such rooms which I might

rent shall be made habitable. It is not reasonable that you should expect me to rely on your acting consistently with the suggestions you make, after your unfortunate outburst in the courtroom last Wednesday.

"You cannot regret as much as I do the unhappy condition of our affairs, but I can truthfully say, without any desire to prolong the differences, that they were not of my making.

"Give me proper evidence of the consistency of your attitude by act and by returning to me my household effects, before you ask of me any proof of my good purposes.

"Waiting to hear further from you, I remain,
"Your husband."


"St. Louis, Mo., June 19,1907.
"Dear Henry: Your note received June 17th, wherein you say that I have put you to costs for lawyers, and placed you in financial debt to others, and that you are in no position to either start to keeping house, or even to rent rooms in which we could live. I don't expect you to rent anything expensive or to go to any place that is beyond your means, but I do feel that as long as we are husband and wife, we should do our best to get along together. You must remember also that I have no means, and that I am in such condition of health that I cannot now earn a living, and I feel that you are the only person on whom I can depend for a living. You asked me to return your household effects to you. You know those were given to me, and that I have been compelled to use them to pay for my board since our separation, and it is impossible for me to get them back now. I don't know what evidence of my 'consistency of attitude' you require. I want to go back to you, and want us to live together as husband and wife, and am willing to do

the best that I can to forget all the unpleasantnesses that have come up between us.

"Your wife,
"THEKLA."

"St. Louis, Mo., June 28, 1907.
"Mrs. Thekla Louis,
3006 Manchester Avenue, City.

"Dear Thekla: Your letter dated the 19th inst. was duly received. It seems that you do not entirely understand my previous letter to you.

"I haven't the means at this time to furnish another household. You are in possession of the only household effects I possess, and with which I could furnish any rooms to be rented. I am not prepared, nor am I disposed to incur expense or liability for renting, unless these household effects are put in my possession, and I am enabled thereby to furnish a home.

"You state that you have been compelled to to use them to pay for your board. I shall be pleased to know in what particular way and manner you have been compelled to and have used such household effects, and what portions of them.

"In addition to the foregoing, the only other offer that I can make is that I will, until my request above has been complied with, or until I am in financial position to consider the outlay for a new outfit of household effects, contribute a reasonable monthly allowance for your support, in keeping with my present income and pecuniary condition.

"Your husband."

"St. Louis, Mo., July 2, 1907.
"Dear Henry: Your letter of the 28th received. As you say you are not able to go to housekeeping, I will accept your offer of a monthly allowance for my support.

"When you are ready to go housekeeping, so am I.

"Your wife,
"THEKLA LOUIS."

St. Louis, July 9, 1907.

"Dear Thekla: Your very abrupt note of the 2nd inst. received.

"Let me ask that you devote time to giving other portions of my letter of the 28th ult. an answer, equal to the time you give to the matter of provisions for support. Read again the third paragraph of that letter. And, incidentally, tell me why such portion of my household effects, other than that which you claim to have been compelled to use for your support, should not be returned to me.

"You don't display the right frankness in the matter, when you choose to ignore the inquiries not agreeable to you. I must ask you to show the same good faith which you expect in turn.

"Until you choose to first fully reply to my letter of the 28th ult., I must withhold any action or other further reply to yours of the 2nd.

"Your husband."

Thereafter defendant refused to contribute anything to plaintiff's support or take any further steps to bring about a reconciliation and renewal of the conjugal relation.

1. It is apparent from the testimony that after the offer on the part of his wife to live with him, to "let bygones be bygones," defendant made as a condition precedent to the renewal of their relation as man and wife, the restoration of the mortgaged household goods, —that he estimated these goods to be of greater value to him than the love and companionship of his wife. By his letters to her he manifested a spirit of stubbornness and littleness which tends more than any other evidence

in the record to corroborate plaintiff's evidence of ill-treatment, and we think shows a clear case of abandonment by the husband without good cause.

2.   Error is assigned in the admission of evidence in respect to the relation of the parties prior to the institution of the divorce suit, for the reason, it is argued, that the judgment in that suit was *res judicata* as to all prior conduct.   That the judgment is not *res judicata* as to anything, except that the indignities alleged in the petition were not offered or, if offered, were not sufficient to warrant a decree of divorce, hence plaintiff was not estopped by it to show her husband's conduct was such as to bring on the disorders of which she complains.

3.   Defendant offered to prove misconduct on the part of plaintiff, at the close of the trial of the divorce suit.   The court refused to hear this evidence and this ruling is assigned as error.   What defendant expected to prove was not stated to the court and is not set out in the record; for this reason this court is not in a position to say that the evidence was admissible or, if admissible, that defendant was prejudiced by its rejection.   [State v. Murphy, 90 Mo. App. 548; Gage v. Trawick, 94 Mo. App. 307; Ruschenberg v. Southern Electric R. R. Co., 161 Mo. 70.]

4.   At the close of the evidence, the court said: "The order of the court will be that if these people will go and live together, without condition and without qualification the suit will be dismissed."   It is contended that the court erred in making this announcement. We think it was not only proper but very opportune as it gave defendant a last opportunity to accept his wife's proposal, made in the letter of June 8th.   His refusal to accept plaintiff as his wife, unconditionally, demonstrates that he did not desire to live with her, and we think his conduct, after the proposal made to him by her in that letter, is indefensible, and demonstrates that he was

lacking in love and affection for her, and that his controlling desire was to get rid of her without expense to himself.

We think the judgment is eminently just and affirm it. All concur.